# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| KAREN S. RHODES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-1715 (RMC) |
| | ) | |
| MICHAEL CHERTOFF, U.S. | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

From April 22, 2001 to October 16, 2001, Plaintiff Karen S. Rhodes was employed by the United States Department of Homeland Security ("DHS") as an office automation assistant in the Freedom of Information Act ("FOIA") branch of the Immigration and Naturalization Service ("INS"). During this period, Ms. Rhodes, a white woman, was a lightning rod for conflict. She argued with co-workers, made remarks pregnant with racial undertones, maligned a supervisor, and engaged in threatening behavior. In response, her supervisors counseled Ms. Rhodes, sent her to Equal Employment Opportunity ("EEO") training, provided a copy of a policy memorandum on the use of racial, ethnic and sexual slurs, and issued letters and other official documents advising her that her status as a probationary employee was in jeopardy. After receiving two-weeks' notice of her scheduled termination, Ms. Rhodes resigned.

After her employment with DHS ended and after pursuing her administrative remedies, Ms. Rhodes filed suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (2000) ("Title VII"), alleging three counts of employment discrimination: 1) reprisal and disparate

discipline; 2) reprisal for prior EEO activity; and 3) disparate discipline.  Defendant moved for summary judgment, arguing that Plaintiff could not make out a *prima facie* case of discrimination and that, even if she could, Ms. Rhodes could not show that Defendant's nondiscriminatory reasons for its actions were pretextual.  Plaintiff opposed, relying solely upon the record supplied by Defendant to support its motion for summary judgment and producing no additional affidavits or documents to support the factual allegations in her complaint.  Defendant filed a reply, contending that Plaintiff's opposition attempted to re-cast the complaint as "hostile environment" and "constructive discharge" claims and that such claims are barred because she has not exhausted her administrative remedies.

The Court finds that even if Ms. Rhodes could make out a *prima facie* case, her claims must fail because she cannot demonstrate that the non-discriminatory reasons for any discipline or adverse action by DHS were pretextual.  The motion for summary judgment will be granted and the case dismissed.

## BACKGROUND[1]

On April 22, 2001, INS hired Ms. Rhodes as an office automation assistant in its FOIA branch.  Statement Of Material Facts As To Which There Is No Genuine Dispute ("Facts") ¶¶ 1-3.  The FOIA branch "office is 98% African-American, and the Unit Chief . . . is African-American."  Ex. 1 ("Holmes Affidavit") at 19.  The terms of Ms. Rhodes's employment required that she successfully complete a one-year period of probation.  *Id.* (citing Ex. 9 ("October 1, 2001 Termination Letter"); Ex. 10 ("October 16, 2001 Request for Personnel Action")).  Although

---

[1]  In resolving this motion for summary judgment, the Court relies upon the undisputed facts supplied by Defendant, affidavits and other documents of record, and those facts provided by Plaintiff that are supported by the record.

her tenure with INS was brief, it was not without incident.

Ms. Rhodes's supervisors repeatedly expressed concern about her work performance. In June 2001, management counseled her regarding personal calls and a failure to turn on her computer until late in the day. Holmes Affidavit at 26. In July 2001, management verbally reprimanded Ms. Rhodes for her failure to follow proper office protocol in receiving and transferring calls to the FOIA branch. *See* Ex. 2 ("Ferguson Affidavit") at 22. In addition, her supervisors questioned the manner by which she was "scanning" documents for use in FOIA processing. *Id*. at 23.

Beyond performance problems, her supervisors felt that "there had been numerous inciden[ts] with Ms. Rhodes blurting out racially charged statements, when the environment had no setting for that kind of statement to be made." Holmes Affidavit at 13. Furthermore, Ms. Rhodes's behavior became erratic and threatening: "she[] moved beyond racially charged statements, into threatening physical body harm. She was calling people on the phone here, harassing them, harassing her supervisor, and so, the environment became one where employees did not want to come to work . . . ." *Id*. at 22.

On May 24, 2001, Ms. Rhodes had an argument with a co-worker. Facts ¶ 8. Ms. Rhodes argues in her brief that she felt threatened when her co-worker attempted to perform a work-related task nearby. *See* Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Opp'n") at 4; Holmes Affidavit at 5; Ferguson Affidavit at 3. They began to argue. The argument became heated and nearly erupted into a physical confrontation. Holmes Affidavit at 5. Although Ms. Rhodes and her co-worker were not disciplined, they received counseling about appropriate workplace behavior. *Id*. at 4.

On June 28, 2001, two of Plaintiff's African-American co-workers complained of offensive comments by Ms. Rhodes during a discussion regarding their braided hair. *See* Facts ¶ 10; *but see* Opp'n at 6 (contending that there is a lack of evidence).   Her supervisor thought that counseling was necessary after this incident because there were no "Caucasian women in the office [who] had their hair braided in such a way. . . . [and] it's a braid of hair, braiding of hair that is indigenous to the way African-American women braid their hair." Holmes Affidavit at 10.   Plaintiff acknowledged that she used the word "hoodlum" to describe persons who wore braids in their hair. Ex. 4 ("Rhodes Affidavit") at 10-11.   She argued, however, that there is "nothing ethnic about the word hoodlum."   *Id*.   In describing the dispute, Ms. Rhodes explained that "[she] does not like talking to some black people, because they take things out of context."   *Id*. at 11.   According to her supervisor, however, "prior to using the word hoodlum, [Ms. Rhodes] had been talking about 'ghetto' and people from the streets, and providing observations of where she identifies women who had their hair in this particular manner."   Holmes Affidavit at 9.

The next day, management issued Plaintiff a "Record of Discussion" concerning the incident.   Facts ¶ 11.[2]   This Record of Discussion noted that Ms. Rhodes "made an offensive ethnic type remark" and, further, that this was the second time that a supervisor was forced to counsel her regarding the use of "inappropriate language in th[e] office."   Ex. 3 ("June 29, 2001 Record of Discussion") at 1.

---

[2]   A Record of Discussion is a written document created when on-the-spot corrections are taking place at the supervisory level in the hope that the supervisor can shape the employee's behavior.   Facts ¶ 12.   If there is no change in behavior, managers may issue a letter of reprimand and subsequently dismiss the employee.   *Id*.

A supervisor reported another altercation a mere two months later.  On August 20, 2001, Plaintiff approached this supervisor about an incident with a co-worker that had occurred the previous week.  Facts ¶ 16.  Ms. Rhodes reportedly became animated and "literally scream[ed] at [the supervisor], using vulgar words" to describe another supervisor.  Ferguson Affidavit at 17.  "I'm sitting there at a very . . . at a terrible disadvantage.  And she is waving her arms and screaming, and I felt that if I looked at her, that she could have become violent."  *Id*.

Less than a month later, Ms. Rhodes received another Record of Discussion for an incident that took place on September 10, 2001.  "As four African American EEO employees were being given a tour of the unit, [Ms.] Rhodes stated to a couple of African American co-workers, in a voice loud enough to be overheard by others, that she had not seen any White people in EEO offices."  Facts ¶ 17 (citing Ex. 7 ("September 14, 2001 Record of Discussion")).  After this incident, Ms. Rhodes's supervisor advised her by letter that, due to her use of "inappropriate racial and sometimes, profane remarks directed towards other employees, including management in this office," she should speak with an Employee Assistance Program counselor.  Ex. 8 ("September 14, 2001 Counseling Letter") at 1.

Over the next two weeks, INS supervisors began the process of fact-finding, counseling, and paperwork in anticipation of terminating Ms. Rhodes's employment.  Facts ¶ 25.  On October 1, 2001, INS notified Plaintiff by letter that her employment would be terminated on October 16, 2001.  *Id*. ¶ 20 (citing Ex. 9 ("October 1, 2001 Termination Letter") and Ex. 10 ("October 16, 2001 Request for Personnel Action")).  The letter explained that Ms. Rhodes was being terminated during her probationary employment period because:

> You have been counseled on three occasions regarding your racial statements to individuals in this office.  You have been advised that these statements divide and interfere with the mission of this office.  You have been sent to mandatory EEO training during the month of August, 2001.  All employees in this office, including you, were furnished a copy of INS's policy regarding use of Racial, Ethnic and Sexual Slurs.

October 1, 2001 Termination Letter at 1.  Ms. Rhodes refused to sign the termination letter.  *Id.* at 2.

Before her scheduled termination date, Ms. Rhodes requested "the right to RESIGN from my job as there obviously is no known promotion potential in that particular office." Ex. 13 ("October 9, 2001 Letter from K. Rhodes") at 1.  INS agreed and processed her termination as a resignation.  *See* Ex. 16 ("Request for Personnel Action") at 1.

## PROCEDURAL HISTORY

Prior to the effective date of termination, and soon after requesting that she be allowed to resign, Plaintiff filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC").  Compl. ¶ 7.  Her October 11, 2001, complaint cited fifteen incidents of discrimination based on her race (white), sex (female), religion (Christian), and disability (physical and mental), as well as claims of reprisal.  *See* Facts ¶ 29 (citing Ex. 14 ("August 27, 2002 Letter of Partial Acceptance of Issues")).   Only eight issues were accepted for investigation.  *Id.* ¶ 31.  Although Ms. Rhodes requested a hearing before an administrative judge, she failed to oppose the agency's  motion for summary judgment.  The administrative judge dismissed six of Plaintiff's allegations for failure to state actionable claims and granted summary judgment in favor of DHS on the remaining allegations.  *See* Ex. 17 ("June 24, 2004 Decision") at 6.

Plaintiff filed suit in this Court on October 7, 2004, alleging that she had exhausted her administrative remedies and charging DHS with three counts of race discrimination. Count One alleges reprisal and disparate discipline arising from the September 10, 2001 incident. Plaintiff claims that her statements to an African-American co-worker "that one doesn't see White people in EEO offices" and that "white employees are probably harassed out of there," Compl. ¶ 9, were not "racist, derogatory or disparaging," *id*. ¶ 15, and, rather, were "tantamount to protesting disparate hiring policies," *id*. ¶ 14. Accordingly, she alleges that the counseling, Record of Discussion, and her discharge for inappropriate and racially-charged sentiments were in violation of Title VII. Count Two charges that Plaintiff was discharged in reprisal for "seeking EEO counseling, pursuing her right to file an employment discrimination complaint and otherwise pursuing her rights protected under Title VII of the Civil Rights Act." *Id*. ¶ 22. Finally, Count Three alleges that her statements regarding the employment of white persons in EEO offices "are no different in character and impact than the statements made contemporaneously by her African-American co-workers," *id*. ¶ 30, and that the failure to discipline those co-workers while threatening to discharge Plaintiff, constituted disparate treatment. *See id*. ¶¶ 31-32.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court must view all facts and reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). To be "material" and "genuine," a factual dispute

must be capable of affecting the substantive outcome of the case.  *Anderson*, 477 U.S. at 247-48; *Laningham v. United States Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).

The moving party must show that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A nonmoving party must establish more than "the existence of a scintilla of evidence" in support of his position, *Anderson*, 477 U.S. at 255, and may not rely solely on allegations or conclusory statements.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rule 56 requires that the party opposing summary judgment go beyond the pleadings and by declarations, depositions, answers to interrogatories or admissions set forth "specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).

## ANALYSIS

Ms. Rhodes brings suit under Title VII, which was passed to eliminate employment discrimination by prohibiting dissimilar treatment of similarly-situated employees on the basis of race, color, religion, sex, or national origin.[3]  *McDonald v. Santa Fe Trail Transp. Co.* 427 U.S. 273, 278-79 (1976).  Prohibitions against discrimination exist "regardless of whether the discrimination is directed against majorities or minorities."  *Trans World Airlines*, *Inc. v. Hardison*, 432 U.S. 63, 71-72 (1977).

To survive a motion for summary judgment, a plaintiff must demonstrate discrimination or retaliation by a preponderance of the evidence.  *See McDonnell Douglas Corp. v.*

---

[3]  Title VII provides that "all personnel actions affecting employees . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16 (2000).

*Green*, 411 U.S. 792, 802 (1973).  This requires first establishing a *prima facie* case that gives rise to an inference of discrimination or retaliation.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-54 (1981).  If a *prima facie* case is made, the burden shifts to the agency to articulate a legitimate, non-discriminatory reason for its actions.  *McDonnell Douglas*, 411 U.S. at 802; *see Burdine*, 450 U.S. at 254 ("[The] defendant need not persuade the court that it was actually motivated by the proffered reasons").  If the agency defendant articulates a legitimate nondiscriminatory reason for its actions, the inference of discrimination is removed, and the plaintiff must "[p]rove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination [or retaliation]." *Burdine*, 450 U.S. at 253.

"Generally, to establish a prima facie case of disparate treatment discrimination, a plaintiff must show that he or she (1) belongs to a protected class; (2) suffered an adverse employment action; and (3) that the unfavorable action gives rise to an inference of discrimination." *Brown v. District of Columbia*, 251 F. Supp. 2d 152, 161 (D.D.C. 2003); *see Stella v. Mineta*, 284 F.3d 135, 146 (D.C. Cir. 2003); *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999).  Disparate treatment requires that the plaintiff "prove that all of the relevant aspects of her employment situation are 'nearly identical' to those of the employees who she alleges were treated more favorably." *Childers v. Slater*, 44 F. Supp. 2d 8, 24 (D.D.C. 1999).  To establish a *prima facie* case of retaliation, a plaintiff must show: 1) she engaged in a protected activity, which was known by the alleged retaliator; 2) she was subject to an adverse action; and 3) there is a causal link between the adverse action and the protected activity.  *See Carney v. Am. Univ.*, 151 F.3d 1090, 1094 (D.C. Cir. 1998); *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 31 (D.C. Cir. 1997); *Passer v. Am. Chem.*

*Soc'y*, 935 F.2d 322, 331 (D.C. Cir. 1991).[4]

    1.    *Plaintiff Cannot Establish a Prima Facie Case*

Not everything that makes an employee unhappy is an actionable adverse action under Title VII. *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). *See Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) ("Actions short of an outright firing can be adverse within the meaning of Title VII, but not all lesser actions by employers count."). In *Brody*, the D.C. Circuit held that a plaintiff must demonstrate that she has suffered "materially adverse consequences affecting the terms, conditions, or privileges of her employment such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm." 199 F.3d at 456-57. Plaintiff's complaint alleges two actions by DHS that are arguably adverse actions: the counseling and Record of Discussion after the incident on September 10, 2001, and her termination, or resignation, in October 2001.[5]

---

[4] DHS argues that Ms. Rhodes cannot establish a *prima facie* case for disparate treatment discrimination because: 1) any reprimand she received in the September 14, 2001 Record of Discussion was not an adverse action; 2) her termination of employment was not an adverse action because she resigned and was not involuntarily discharged; and 3) she cannot produce any evidence that gives rise to an inference of discrimination. DHS further argues that Ms. Rhodes cannot establish a *prima facie* case of retaliation because she cannot establish a causal connection between her alleged "protected activity and her termination during [t]he probationary period." Defendant's Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Mem.") at 19. Finally, Defendant argues that even if Ms. Rhodes can establish her *prima facie* case of discrimination or reprisal, she cannot demonstrate that DHS's legitimate, nondiscriminatory reasons for its action were pretextual.

[5] In its Reply, DHS argues that Plaintiff improperly attempts to argue a "hostile work environment" claim in her Opposition that was not exhausted in administrative proceedings. The Court agrees. A claim of hostile work environment arises when conditions are infused with sufficiently severe "discriminatory intimidation, ridicule and insult" such that it "alter[s] the conditions of the victim's employment and create[s] an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993) (internal quotation marks and citations omitted). There is no basis in the record for a hostile environment claim by Ms. Rhodes, even if one could

Here, the oral counseling by INS supervisors and the Record of Discussion were not adverse actions. Ms. Rhodes suffered no diminution in pay or responsibility as a result of this counseling and her status as a probationary employee remained unchanged. Standing alone, evaluations and counseling do not materially affect an employee such that they create tangible harm. *Brody*, 199 F.3d at 458 & n.11 (poor evaluations are not necessarily adverse actions); *Ware v. Billington*, 344 F. Supp. 2d 63, 75 (D.D.C. 2004) (counseling memorandum alone is not an adverse action).

A "tangible employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). DHS disputes Plaintiff's contention that she was involuntarily terminated because "Plaintiff was permitted to resign and have her personnel record reflect a resignation rather than a termination." Mem. at 14 (citing Request for Personnel Action). It argues that a resignation is not involuntary simply because an employee is faced with the unpleasant alternative of resignation or termination. *Id.* (citing *Keyes v. District of Columbia*, 372 F.3d 434 (D.C. Cir. 2004)). Although this argument has some merit in the circumstances of this case, the Court need not rest its decision on such niceties because Plaintiff has not established other required elements of her *prima facie* case.

First, Ms. Rhodes has not met her burden under a disparate treatment theory because she has not shown that a termination occurred under circumstances that give rise to an inference of discrimination. Such an inference is established by showing that an employer took its action based

---

now be advanced. In fact, the record provides more support for the converse. Plaintiff's actions and statements appear to have created such an environment for her colleagues.

on the plaintiff's membership in a protected class. *Forkkio*, 306 F.3d at 1130. Here, Ms. Rhodes has failed to present competent evidence showing that she was terminated for an improper reason. Instead, the record indicates that her short tenure with INS was tumultuous and marred by interoffice conflict and inappropriate behavior. Even accepting Plaintiff's argument that the counseling and written report in September were somehow tainted by discriminatory animus on the part of DHS, the decision to terminate her employment was informed by many other incidents and reports regarding her performance as an employee.[6]

Second, with regard to her claim of disparate treatment, Ms. Rhodes cannot show that she was treated differently than similarly-situated employees. The co-workers who were allegedly involved in altercations with Ms. Rhodes were not probationary employees, as was she. *See Holbrook v. Reno*, 196 F.3d 255, 262 (D.C. Cir. 1999) (questioning how a probationary trainee "could possibly be similarly situated" to a veteran employee); *McKenna v. Weinberger*, 729 F.2d 783, 789 (D.C. Cir. 1984) (drawing distinction between probationary employee and permanent employee); *Allen v. Ohio Dep't of Rehab. and Corr.*, 128 F. Supp. 2d 483, 494 (S.D. Ohio 2001)

---

[6] Ms. Rhodes appears to argue a claim of constructive discharge in her Opposition. The Court agrees with Defendant that this claim is improper because it was not exhausted in administrative proceedings. Even if accepted, however, the claim would be without merit. A *prima facie* case of discriminatory discharge is established if the plaintiff shows: 1) she is a member of a protected class; 2) she was qualified for the position; (3) she was discharged (actually or constructively); and 4) similarly situated employees were not discharged. *See Valentino v. USPS*, 674 F.2d 56, 67 n.15 (D.C. Cir. 1982) A plaintiff who advances a claim of constructive discharge must show "working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, ___, 124 S. Ct. 2342, 2351 (2004). "Not only must plaintiff demonstrate that there was intentional discrimination, but plaintiff must also establish the presence of 'aggravating factors.'" *Crenshaw v. Georgetown Univ.*, 23 F. Supp. 2d 11, 19 (D.D.C. 1998) (quoting *Dashnaw v. Pena*, 12 F.3d 1112, 1115 (D.C. Cir.1994)). At a minimum, Ms. Rhodes has not provided evidence to establish that her working conditions were intolerable.

(noting plaintiff could not establish the similarly-situated requirement because no other employee was a probationary employee and no other employee was charged with as many infractions); *Mercer v. City of Cedar Rapids*, 104 F. Supp. 2d 1130, 1145-46 (N.D. Iowa 2000) (examining cases and noting the difference between probationary and permanent employees).  In addition, Plaintiff has not shown that these other employees were involved in as many workplace incidents in a similarly-short period of time.[7]

Finally, Ms. Rhodes has not met her *prima facie* burden under a retaliation theory because she has not established a causal link between the alleged retaliatory action (the October 1, 2001 threat of termination) and her allegedly-protected activity (the EEO complaint).[8]  At least one

---

[7] Plaintiff appears to argue that she was treated differently than another probationary employee who had been terminated because, unlike that probationary employee, Ms. Rhodes was escorted out of the building on her last day.  However, Plaintiff has produced no information to refute the assertion that this employee "did not have confrontations with individuals. . . , never exhibited any tendencies towards violence [n]or threaten[ed] a supervisor and any other employee, [and] did not need to be escorted out."  Ferguson Affidavit at 19.  *See also id.* at 20 (contending that Ms. Rhodes was deemed a threat because she said, "I know street fighting and I can defend myself, and I will defend myself.").

[8] The Court rejects Ms. Rhodes's claim that "by every reasonable inference" her statements regarding the absence of white employees were protected activity under 42 U.S.C. § 2000e3(a) as comments "opposing discriminatory hiring and retention practices."  Opp'n at 4.  "[D]isruptive or unreasonable protests against discrimination are not protected activity under Title VII and therefore cannot support a retaliation claim."  *Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000).  *See, e.g., Robbins v. Jefferson County Sch. Dist.*, 186 F.3d 1253, 1260 (10th Cir.1999) ("[W]e hold that, as a matter of law, these activities were not reasonable and did not constitute protected opposition.");  *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir.1996) ("An employee's opposition activity is protected only if it is reasonable in view of the employer's interest in maintaining a harmonious and efficient operation.");  *Hochstadt v. Worcester Found. for Experimental Biology*, 545 F.2d 222, 230 (1st Cir. 1976) (discussing "whether plaintiff's overall conduct was so generally inimical to her employer's interests, and so excessive, as to be beyond the protection of section 704(a) [of Title VII] even though her actions were generally associated with her complaints of illegal employer conduct.").  INS supervisors repeatedly warned Ms. Rhodes that her racially-charged comments unacceptably disrupted the office's operations.  Instead of adjusting her temperament and crafting a more

of her supervisors was unaware that Plaintiff had contacted the EEO office to complain of reverse

discrimination.   Holmes Affidavit at 23.   Moreover, INS management claims to have begun

researching the dismissal process in mid-September – almost two weeks before, according to

Plaintiff's counsel, the EEO counselor purportedly informed Ms. Rhodes's supervisors of her

complaint.  *Id.*[9]  Accordingly, Ms. Rhodes has offered no evidence linking the threats of dismissal

to any protected conduct nor shown how the proposed termination was triggered by anything other

than her own poor performance and divisive attitude.

> 2.      *Plaintiff Cannot Show Defendant's Articulated Reasons Are Pretextual*

The D.C. Circuit in *Brody* provided the analytical framework for cases alleging that

an employer's proffered reasons are pretextual.

> Assuming then that the employer has met its burden of producing a
> nondiscriminatory reason for its actions, the focus of proceedings at
> trial (and at summary judgment) will be on whether the jury could
> infer discrimination from the combination of (1) the plaintiff's prima
> facie case; (2) any evidence the plaintiff presents to attack the
> employer's proffered explanation for its actions; and (3) any further
> evidence of discrimination that may be available to the plaintiff (such
> as independent evidence of discriminatory statements or attitudes on

---

sensible protest, Ms. Rhodes continued to blurt out unpleasant and frequently-insulting remarks.
Accordingly, the Court views Ms. Rhodes's comments of September 10 and 11, 2001 as simply
additional incidents in a series of events that caused conflict in the office, and not as statements
protected under Title VII.

[9]  In her opposition to Defendant's motion, Ms. Rhodes asserts that "[o]n September 27,
2001 EEO Counse[lor] Juanita Boyd contacted Ms. Ferguson and Mr. Holmes about Ms.
Rhodes['s] complaint of discrimination.  When asked if they would agree to a transfer for Ms.
Rhodes they refused."  Opp'n at 8.  Other than this brief statement made through her attorney,
Plaintiff offers absolutely no evidence in support of the existence of this conversation.  She did
not attach a single affidavit or document to her opposition that would lead the Court to believe a
discussion between INS supervisors and an EEO counselor actually took place on September 27,
2001.  Therefore, in deciding this issue the Court relies on Mr. Holmes's sworn statement that
"[he] had no knowledge that Ms. Rhodes had contacted [the EEO]."  Holmes Affidavit at 23.

> the part of the employer) or any contrary evidence that may be
> available to the employer (such as evidence of a strong track record
> in equal opportunity employment).

*Brody*, 199 F.3d at 458 (quoting *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir.

1998)).

Plaintiff's record of performance speaks for itself.  Ms. Rhodes had become a

distraction to her supervisors and colleagues, was counseled for poor work performance and for

arguing with co-workers, and received letters and other documents expressing concern over

inappropriate, racially-charged comments.  The thrust of Ms. Rhodes's complaint is that she was

engaged in protected activity when, in September 2001, she made comments regarding the absence

of whites in EEO offices.  This one incident cannot be viewed in isolation.

> Plaintiff began her employment on April 22, 2001.  By May 24, 2001,
> she was involved in an altercation with a co-worker.  In a few months
> of working for Defendant, Plaintiff made comments perceived to be
> racially offensive to her co-workers on at least three occasions and
> management appropriately did not allow her employment to continue
> beyond the probationary period.  In light of the long documented
> history of plaintiff's misbehavior and inappropriate comments
> beginning shortly after she began her employment all the way through
> the end, Plaintiff[] simply cannot raise the inference that the reasons
> for which she was disciplined and given a letter of termination were
> on account of her race.

Mem. at 17.  To credit a single alleged protest of disparate hiring practices ignores this rich history

of inappropriate behavior.[10]

---

[10]  Even if the Court suspected Ms. Rhodes had been treated unfairly, it is not free to
second-guess INS's business judgment without evidence to the contrary.  *Brody*, 199 F.3d at 458-
59.  "Once the employer has articulated a non-discriminatory explanation for its action," as INS
did here, "the issue is not 'the correctness or desirability of [the] reasons offered . . . [but]
whether the employer honestly believes in the reasons it offers.'"  *Fischbach v. D.C. Dep't. of
Corrs.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *McCoy v. WGN Cont'l Broad. Co.*, 957
F.2d 368, 373 (7th Cir.1992)).  The Court has no reason to doubt Defendant's explanation

As in *Brody,* Ms. Rhodes has "offered nothing beyond her own speculations and allegations to refute the . . . legitimate, non-discriminatory reasons for [INS's] decisions." 199 F.3d at 458. Indeed, it seems clear that "plaintiff's inability to get along with her co-workers was a function of her individual personality difficulties and was not related to" her membership in a protected class or in response to a protected EEO activity. *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984). Because Ms. Rhodes has provided no evidence "to create a genuine issue of fact regarding [INS's] articulated reasons," she cannot defeat Defendant's motion for summary judgment. *Brody*, 199 F.3d at 459 (quoting *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988)).

## CONCLUSION

Defendant's motion for summary judgment will be granted and the case dismissed. A separate order accompanies this memorandum opinion.

DATE: August 4, 2005.                           /s/
                                        ROSEMARY M. COLLYER
                                        United States District Judge

---

because the record here is replete with instances justifying management's belief that Ms. Rhodes was disruptive to the organization's mission and distracting to her co-workers.